UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

WILLIAM STEWART,

                        Plaintiff,

        v.

CAROLYN W. COLVIN, Acting Commissioner of
Social Security,

                      Defendant.

-------------------------------------------------------------

**MEMORANDUM & ORDER**
15-CV-2427 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff William Stewart filed the above-captioned action pursuant to 42 U.S.C.
§ 405(g), seeking review of a final decision of the Commissioner of Social Security (the
"Commissioner") denying his claim for disability insurance benefits. The Commissioner moves
for judgment on the pleadings, arguing that the decision by Administrative Law Judge ("ALJ")
Edward H. Hein ("ALJ Hein") is supported by substantial evidence and should be affirmed.
(Comm'r Not. of Mot. for J. on Pleadings, Docket Entry No. 18; Comm'r Mem. in Supp. of Mot.
for J. on the Pleadings ("Comm'r Mem."), Docket Entry No. 19.) Plaintiff cross-moves for
judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure,
arguing that ALJ Hein's decision is not supported by substantial evidence and that ALJ Hein:
(1) erred by failing to properly consider evidence subsequent to Plaintiff's last-insured date;
(2) improperly concluded that Plaintiff's personality disorder was not a severe impairment; and
(3) erred in relying on the ALJ's own subjective views and on the opinion of the consultative
examiner. (Pl. Cross-Mot. for J. on Pleadings, Docket Entry No. 20; Pl. Mem. in Supp. of
Cross-Mot. for J. on the Pleadings ("Pl. Mem.") 20–32, Docket Entry No. 21.) For the reasons

set forth below, the Commissioner's motion for judgment on the pleadings is denied and Plaintiff's cross-motion for judgment on the pleadings is granted.

## I. Background

Plaintiff was born in 1959. (R. 27, 85.) He completed college and received a degree in electronics from New York City Technical College in 1982. (R. 30–31, 113.) Plaintiff filed for disability insurance benefits on June 15, 2007, alleging disability since May 25, 2005, due to depression, social anxiety disorder, post-traumatic stress syndrome, hearing loss and insomnia. (R. 85–88, 109.) Plaintiff's application was denied. (R. 54–57.) Plaintiff requested a hearing before an ALJ, which was held on April 14, 2009 before ALJ Harvey Feldmeier ("ALJ Feldmeier"). (R. 23–47.) By decision dated August 4, 2009, ALJ Feldmeier found that Plaintiff was not disabled prior to December 31, 2005, the date he was last insured for disability insurance benefits, and denied Plaintiff's application. (R. 12–22.) On April 28, 2010, the Appeals Council denied review of ALJ Feldmeier's decision. (R. 1–3.)

Plaintiff filed a civil action in the United States District Court for the Eastern District of New York challenging the denial. By Memorandum and Order dated February 1, 2012, Judge Dora Irizarry granted Plaintiff's motion for judgment on the pleadings, vacated the final decision of the Appeals Council, and remanded the case for further proceedings (the "2012 Decision"). *Stewart v. Astrue*, No. 10-CV-3032, 2012 WL 314867, at *10 (E.D.N.Y. Feb. 1, 2012); (*see* R. 457–74.) Judge Irizarry held that ALJ Feldmeier's decision was not supported by substantial evidence because (1) he failed to adequately consider medical evidence that, as of July 18, 2005, Plaintiff had a global assessment of functioning ("GAF") score of 50,[1] and (2) he failed to

---

[1] The GAF score is a numeric scale ranging from "0" (lowest functioning) through "100" (highest functioning). "The GAF is a scale promulgated by the American Psychiatric

adequately consider whether medical evidence subsequent to Plaintiff's last insured date was relevant to ALJ Feldmeier's decision that Plaintiff was not disabled prior to December 31, 2005. *Stewart*, 2012 WL 314867, at *8–10. As to the GAF score, Judge Irizarry noted that, because ALJ Feldmeier failed to address this portion of the record, he had "ignore[d] parts of the record that are vital to [] Plaintiff's disability claim." *Id*. at *8. As to the medical evidence subsequent to Plaintiff's last-insured date, Judge Irizarry explained that it was inappropriate for ALJ Feldmeier to "disregard[]" opinions by treating sources later than December of 2005 because "the Second Circuit has recognized that medical evidence obtained subsequent" to that date could be relevant to the severity and continuity of Plaintiff's impairments before the last-insured date. *Id*. at *10 ("[T]he ALJ erred in failing to pursue and consider the possibility of retrospective diagnoses based on [the] subsequent medical findings.").

On remand, Plaintiff appeared before ALJ Hein for a hearing on February 7, 2013. (R. 388–438.) By decision dated December 26, 2013, ALJ Hein found that Plaintiff was not disabled on or before December 31, 2005, the date he was last insured. (R. 480–501.) On February 25, 2015, the Appeals Council denied review of ALJ Hein's decision. (R. 369–72.)

### a. Plaintiff's work history

Plaintiff worked as a lab technician and a funeral director before opening a photocopy shop in 1989. (R. 252, 742, 922.) From September of 1989 through May of 2005, Plaintiff and his business partner owned and operated the photocopy shop. (R. 31–35, 101–02.) Plaintiff

---

Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" *Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, at 32 (4th ed. 2000)). "A GAF between 51 and 60 indicates '[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers).'" *Id*. (quoting *Diagnostic and Statistical Manual of Mental Disorders*, at 34.)).

"worked mostly at night, after the store closed" to process copy jobs from the day. (R. 109.) According to Plaintiff, he "ran the entire operation of [the] copy shop," which included standing and lifting up to 50 pounds, including carrying paper orders into the basement of the store, as well as taking inventory, paying bills and taxes, and cleaning. (R. 102, 110.) Following the terrorist attacks of September 11, 2001 ("September 11"), the store's business declined, and after multiple years of losses, Plaintiff closed the store in May of 2005. (R. 34, 109.)

### b. Plaintiff's testimony

#### i. 2009 hearing

At the April 14, 2009 hearing, Plaintiff testified that he lived with his mother, who lived several blocks away from his two sisters. (R. 28–29.) Plaintiff traveled to the hearing by subway and bus. (R. 28–29.) Plaintiff had last driven about two weeks prior to the hearing, to do an errand for his family. (R. 28.)

Plaintiff testified that he was unable to work because he had "great difficulty" concentrating. (R. 35.) When asked whether he liked being around people, Plaintiff stated that "[t]hey're okay," and that he could "deal with people." (R. 36.) After 2001, Plaintiff drank heavily every day. (R. 38.) In October of 2003, Plaintiff was drinking two six-packs of beer daily to deal with stress. (R. 37, 41.) At the time of the hearing, Plaintiff drank a beer "once in a while," (R. 37), and was managing his stress and anxiety with Zoloft, (R. 42).

As of 2003, his business partner was handling much of the work at the copy center. (R. 40.) His partner took care of customers who came in during the day, and Plaintiff would process large jobs at night. (R. 40.) Plaintiff worked five to six nights a week, decreasing to less than once a week as business slowed. (R. 40.)

### ii.   2013 hearing

At the January 17, 2013 hearing, Plaintiff testified that he had witnessed the events of September 11, which had exacerbated his depression.  (R. 395.)  Plaintiff explained that, prior to September 11, he "used to work up in the front" of the store during the day and deal with customers, but that after September 11, he worked "mostly in the back of the store" and did not "deal with the customers."  (R. 411–12.)  Plaintiff explained that he would do "all the night work [himself]" so that he could concentrate when it was "very quiet."  (R. 412.)

Plaintiff was living with his 86-year-old mother, who had cataracts, arthritis in the knees, and chronic obstructive pulmonary disease ("COPD").  (R. 399–400.) Plaintiff had difficulties living with his mother, including feeling "enrage[d]" that she moved or touched his things, although she believed she was helping him.  (R. 400.)  Plaintiff did not interact socially with people outside of his family.[2]  (R. 411.)

Plaintiff stopped receiving mental health treatment in June of 2005, and things got "worse and worse" after he was evicted and "had to move to Brooklyn."  (R. 401.)  He preferred "staying home" rather than traveling to Manhattan for treatment.  (R. 401.)  Plaintiff further explained that he believed that he "might get better" if he moved away from Manhattan, where he feared "the threat of terrorism every day."  (R. 401.)  At the time of the hearing, the news was no longer covering terrorism threats every day, but "[t]hat's all it was for several years," which Plaintiff described as "very disturbing."  (R. 401–02.)  Plaintiff continued attending therapy and he "only had the break when [he] had to move from Manhattan to Brooklyn," but he continued his medication during that time.  (R. 421.)

---

[2]  Plaintiff stated that he had no severe physical issues, that his exertional limitations related to fatigue, and that he was alleging disability entirely due to non-exertional mental issues. (R. 397–98.)

Plaintiff closed his business after September 11 caused a downturn in the economy. (R. 403.) In addition to the "economy going bad," he was also "too . . . weak, unable to function, to keep trying to push and keep it open." (R. 404.) Plaintiff had not attempted to reopen the store, but had considered looking for other work. (R. 404.) When he attempted to complete applications he experienced an "interior battle" and felt "very weak, like the energy is drained out of my body." (R. 404.) The thought of having to go for an interview drained Plaintiff. (R. 405.) Plaintiff believed that he would have problems working for someone else. (R. 405.)

When asked if he still drank, Plaintiff stated that he would occasionally have a beer with company. (R. 409.) Plaintiff denied that drinking had ever been a serious problem, and explained that in 2005, at the time of his initial application for disability benefits, he had been "drinking beer to overcome the stress and the problem with [September 11], which was every day, everywhere, for [a] very extended time." (R. 409.) Plaintiff stated that his psychological symptoms were the same with or without alcohol. (R. 410.)

### c. Medical evidence

#### i. Evidence prior to Plaintiff's alleged onset date of May 25, 2005

##### 1. Jewish Board of Family and Children's Services

On October 16, 2003, Plaintiff sought treatment for depression at the Jewish Board of Family and Children's Services ("JBFCS"), and was evaluated by Dr. Michael Merkin, M.D. (R. 141–64.) Upon intake, Plaintiff stated that he experienced life-long depression, and that he could only remember a few happy days in his life. (R. 141.) Plaintiff explained that his depression had increased since September 11, and that "everyday life [had] been a real struggle" since then. (R. 141.) Plaintiff owned a photocopy business, which had been affected by the loss of accounts after September 11. (R. 141, 163.) Plaintiff's "financial difficulties [had]

contributed to [his] depression," and he had no idea how to overcome the problem. (R. 141.) He stated that his business partner "handle[d] the brunt of whatever work remains." (R. 141.)

Plaintiff often felt nervous, scared, anxious or unable to relax. (R. 144.) He had experienced sudden feelings of intense fear or panic. (R. 144.) Plaintiff stated that when his store filled with people "demanding things," he would "freeze." (R. 144.) He complained of experiencing shortness of breath and dry mouth and of becoming easily fatigued. (R. 144.) Plaintiff had difficulty controlling worries, was irritable and had difficulty concentrating. (R. 144.) He had trouble falling asleep and awoke at night and early in the morning. (R. 144.) Plaintiff lost interest or pleasure in doing things and had been feeling down, depressed or hopeless. (R. 144.) Plaintiff also experienced a loss of sexual drive and pleasure, psychomotor retardation, agitation, difficulty thinking, indecisiveness, and recurrent thoughts that he would be better off dead, although he had no current or past suicidal behavior. (R. 145.) He lost his temper, yelled at others and was "impatient or fidgety." (R. 146.) Plaintiff reported that he drank alcohol daily with no adverse reactions, although he believed that he should reduce his drinking and his family and business partner had complained about his drinking. (R. 148.)

Plaintiff reported a history of being physically and emotionally abused by his father, and having witnessed domestic violence. (R. 149.) Plaintiff also identified witnessing September 11 as a source of trauma. (R. 149.) He experienced flashbacks and "intense psychological stress in response to reminders." (R. 150.) Plaintiff felt "detached or estranged from others" and avoided places, thoughts and feelings. (R. 150.) Plaintiff experienced irritability, difficulty concentrating and angry outbursts. (R. 150.) He had diminished interest in activities and felt numb and detached. (R. 151.) Plaintiff was living with his business partner due to his finances, and was unsatisfied with his "stressful" living situation. (R. 153.) Among Plaintiff's "potential barriers

to optimal functioning," Dr. Merkin identified Plaintiff as having difficulties with interpersonal relationships and being socially withdrawn.  (R. 156.)

Dr. Merkin performed a mental status examination of Plaintiff.  (R. 157.)  Plaintiff made good eye contact and was calm, cooperative, warm and friendly, but his eagerness to please was considered inappropriate.  (R. 157.)  Plaintiff was also ill-at-ease and appeared sad and anxious.  (R. 158.)  Plaintiff was attentive and demonstrated sustained concentration.  (R. 159.)  Plaintiff's recent and past memory was intact, and he was preoccupied with fears and hopelessness.  (R. 159–60.)  He expressed no suicidal or homicidal thoughts and had no delusional thinking.  (R. 161.)  Plaintiff described that he became irritable when his business partner "pushe[d] his buttons," which Dr. Merkin categorized as "occasional loss of impulse control."  (R. 161.)

Dr. Merkin found that Plaintiff had a life-long history of depression, which was untreated except for a brief trial of Zoloft four years prior, with minimal effects.  (R. 163.)  Dr. Merkin observed that Plaintiff's depression "deepened" due to witnessing September 11 and the subsequent significant business losses.  (R. 163.)  Plaintiff also had a history of abuse as a child.  (R. 163.)  Dr. Merkin noted "significant" symptoms of depression and anxiety, including sleep disturbance, difficulty concentrating, and irritability.  (R. 163.)

### ii.  Evidence between May 25, 2005 and December 31, 2005

#### 1.  Jewish Board of Family and Children's Services

A July 18, 2005 discharge summary by Dr. Merkin states that Plaintiff began treatment in October of 2003 and attended weekly individual psychotherapy sessions and monthly medication visits until June 1, 2005, when Plaintiff moved out of his apartment and closed his business.  (R. 136.)  Plaintiff then moved to his mother's house in Brooklyn, at which time his therapy attendance became erratic.  (R. 136.)  Plaintiff cited family obligations, increased fatigue and sleepiness, and the long commute to the clinic as reasons for his missed appointments.  (R. 136.)

In responding to a call to confirm his appointment for July 18, 2005, Plaintiff left a voice message that he would be traveling and visiting friends for the remainder of the summer. (R. 136.)  JBFCS closed Plaintiff's case and encouraged Plaintiff to renew his medication prescriptions for Zoloft and Ambien.  (R. 136.)

Plaintiff's treatment had focused on symptoms of depression and anxiety stemming from the failure of his business, his planning for the end of his business, and his experiences concerning September 11.  (R. 136.)  Plaintiff reported that his anxiety was significantly reduced early in his medication regimen.  (R. 136.)  His depressive symptoms improved to some degree, but he continued to report feeling "blank" and had a lack of motivation, difficulty sleeping, and increased fatigue.  (R. 136.)  Dr. Merkin stated that, although Plaintiff had "demonstrated improvements over the course of treatment in terms of sleeping regularly, drinking significantly less, and appropriately expressing his emotions verbally," the loss of his business and apartment and his move to Brooklyn had "precipitated an increase in depressive symptoms, including difficulty falling asleep, sleeping during the day, lack of energy and motivation, general dysphoria, and noncompliance with treatment."  (R. 136.)  Plaintiff's progress towards discharge at that time was characterized as "regression."  (R. 136.)  Dr. Merkin noted that Plaintiff's diagnoses were major depressive disorder, recurrent and moderate, and personality disorder, not otherwise specified ("NOS").  (R. 139.)  Plaintiff's GAF was rated at 50.[3]  (R. 139.)

---

[3]  A GAF of between 41 and 50 indicates serious symptoms or serious impairment in social, occupational or school functioning.  Am. Psych. Ass'n  Diagnostic & Stat. Manual of Mental Disorders 34 (4th ed.).

## 2. Dr. Sultan Khan

Dr. Sultan Khan, M.D, Plaintiff's primary care physician, began treating Plaintiff on September 29, 2005, and saw him every three to four months. (R. 173.) Dr. Khan diagnosed Plaintiff with anxiety and depression. (R. 173.)

### iii. Evidence after December 31, 2005

#### 1. Dr. Khan

The record contains treatment notes from Dr. Khan from February 10, 2007 through April 21, 2012.[4] (*See* R. 301–16, 679–86, 688–703, 708–18, 720.) In a letter dated June 12, 2007 and addressed "To Whom it May Concern," Dr. Khan wrote that Plaintiff had a history of depression and anxiety disorder. (R. 318.) Plaintiff was progressively losing interest in daily activities. (R. 318.) He was non-compliant with medical follow-up despite taking Zoloft and Ambien daily. (R. 318). Dr. Khan advised Plaintiff to see a psychiatrist. (R. 318.)

On July 26, 2007, Dr. Khan completed a medical report for Plaintiff's disability benefits application, having examined Plaintiff that day. (R. 173–77.) Plaintiff's symptoms included "chronic" anxiety and depression, for which Dr. Khan prescribed Zoloft and Ambien and weekly psychotherapy sessions. (R. 174.) Dr. Khan determined that Plaintiff was limited by an inability to concentrate.[5] (R. 176.) Dr. Khan noted that Plaintiff's history of depression and anxiety limited proper communication. (R. 178.)

---

[4] An undated "therapeutic record" noted that Plaintiff's medication included Zoloft, Ambien, Wellbutrin and Risperdal, but the record does not include dates associated with the prescriptions. (R. 308.)

[5] Dr. Khan also commented on Plaintiff's physical limitations, which are not relevant here.

On February 10, 2009, Dr. Khan completed a supplemental questionnaire as to Plaintiff's residual functional capacity.  (R. 320–21.)  Dr. Khan stated that Plaintiff experienced "moderately severe"[6] limitations in his ability to relate to other people, to comprehend and follow instructions, to perform work requiring frequent contact with others, to perform work where contact with others was minimal, to perform complex tasks, to perform varied tasks, and to perform full time work in a routine work setting.  (R. 320.)  According to Dr. Khan, Plaintiff also had a "moderate" degree of restriction in daily activities, of deterioration of his personal habits, and of constriction of his interests.  (R. 320.)  Plaintiff was "mildly" limited in performing simple and repetitive tasks.  (R. 320.)

On March 26, 2009, Dr. Khan completed a general medical report at the request of the SSA.  (R. 349–57.)  Dr. Khan stated that he had treated Plaintiff every three months since September 29, 2005 for depression, anxiety, chronic allergic rhinitis, and hypercholesterolemia, and had last seen Plaintiff on March 14, 2009.  (R. 349.)  Dr. Khan described Plaintiff's depression and anxiety as "chronic."  (R. 350.)  He indicated that Plaintiff could only tolerate quiet conditions, and that Plaintiff could never work at unprotected heights or near moving mechanical parts, operate a motor vehicle, work under humid and wet conditions, or be exposed to dust, odors, fumes, pulmonary irritants, and vibrations.  (R. 356.)  Dr. Khan concluded that Plaintiff was not capable of performing activities like shopping or traveling without a companion and was also unable to care for his personal hygiene.  (R. 357.)  According to Dr. Khan, these limitations had been present since September 29, 2005.  (R. 357.)

---

[6]  A "moderately severe" limitation was defined as an impairment that seriously affects an ability to function.  (R. 320.)

## 2. JBFCS

Plaintiff returned to JBFCS for continued treatment in April of 2007. (R. 323.) Plaintiff was given a treatment plan, which contained diagnoses of dysthymic disorder, a long-term form of depression; major depressive disorder, recurrent, beginning October 16, 2003; and personality disorder, NOS, beginning October 14, 2004. (R. 325.) Plaintiff's GAF was 47. (R. 325.)

### A. Dr. Zanaida Luft

Dr. Zanaida Luft, M.D., a psychiatrist at JBFCS, completed a treatment plan for Plaintiff on July 17, 2007. (R. 328–33.) Dr. Luft noted that Plaintiff was previously a client in the Manhattan West office, where he had undergone treatment for close to two years. (R. 328.) Plaintiff had reentered treatment because his symptoms got worse after he moved from Manhattan to Brooklyn to live with his mother. (R. 328.) Plaintiff reported feeling numb and unmotivated to engage in activities. (R. 328.) Dr. Luft observed that Plaintiff continued to display depressive symptoms regarding September 11, his closed business, and living at home with his mother. (R. 328.) Dr. Luft diagnosed Plaintiff with personality disorder and dysthymic disorder. (R. 322.) Plaintiff's GAF was 50. (R. 328.) Plaintiff had been compliant in taking Zoloft and Ambien, both of which had been prescribed by an outside doctor. (R. 328.)

Dr. Luft evaluated Plaintiff again on August 7, 2007. (R. 246–54, 335–47.) Plaintiff was taking Zoloft, which his primary care physician had prescribed. (R. 335.) Plaintiff reported feeling depressed and hopeless, with low energy, and being "unable to get himself to move." (R. 252, 335.) He reported that his primary care physician no longer prescribed him Ambien and that he had problems sleeping. (R. 335.) Plaintiff reported that his symptoms had deteriorated in the prior months, but that he had experienced depressive symptoms most of his life and that his severe depression had been triggered by witnessing September 11. (R. 252.) Plaintiff still

experienced an anxiety reaction to the sound of helicopters as a result of his living in Manhattan after September 11.  (R. 335.)  Dr. Luft diagnosed Plaintiff with major depressive disorder, recurrent, moderate; dysthymic disorder; and personality disorder, NOS.  (R. 253.)  His GAF was 50.  (R. 253.)

Plaintiff told Dr. Luft that he was living with his family, and was not bothered by his mother but would like to live on his own.  (R. 346.)  He used his savings to support himself and accepted some money from his mother.  (R. 346.)  He was unemployed and not seeking work, and did not want to work for anybody.  (R. 346.)  Plaintiff had no current peer relationships or social supports, was socially withdrawn, and had difficulty with interpersonal relationships.  (R. 346.)  Plaintiff recounted that he had experienced physical abuse as a child and had witnessed domestic abuse.  (R. 346.)

Dr. Luft conducted a mental status examination of Plaintiff.  (R. 247.)  Plaintiff maintained steady eye contact and was cooperative.  (R. 247.)  His psychomotor activity was calm, and he appeared comfortable.  (R. 247.)  Plaintiff was composed and articulate and spoke in an expressive manner at an appropriate volume and rate.  (R. 247–48.)  Plaintiff's mood was depressed, and his thought process was organized and goal-directed.  (R. 247–48.)  Plaintiff denied suicidal or homicidal thinking.  (R. 250.)  Plaintiff was alert, but he appeared distracted and his concentration, as tested by serial subtraction and reverse spelling, was impaired.  (R. 249.)  Plaintiff's ability to understand abstractions and his insight were intact, including his ability to acknowledge his problems and accept the need for treatment.  (R. 249.)  Plaintiff was diagnosed with major depressive disorder, recurrent, moderate; dysthymic disorder; and personality disorder, NOS.  (R. 253.)  Plaintiff's GAF was rated at 50.  (R. 253.)

### B.   Dr. Jesse Hilsen

On or about October 19, 2007, Dr. Jesse Hilsen, M.D., prepared a treatment plan review. (R. 255–61.)  Dr. Hilsen noted that Plaintiff's response to treatment was "minimal," despite regular therapy sessions and despite his compliance with medication prescriptions for Wellbutrin, Ambien and Zoloft.  (R. 255–57.)  Plaintiff continued to live with his mother, and stated that he felt numb and tired and that days passed "without him noticing."  (R. 255.) Plaintiff felt that time had stopped when he lost his business.  (R. 255.)  Dr. Hilsen reported that Plaintiff "concentrates heavily on governmental policies and politics and how they have failed him."  (R. 257.)  Plaintiff was able to complete minimal tasks around the home, which he attributed to his medications.  (R. 257.)  Plaintiff's GAF was lowered from 50 to 45 because he did "not appear to be functioning at an optimal level socially or occupationally."  (R. 256.)

### C.   Dr. Richard Arking

On January 3, 2008, Dr. Richard Arking, M.D., a psychiatrist at JBFCS, completed a report for Plaintiff's disability benefits application.  (R. 217–23.)  Dr. Arking stated that Plaintiff was first seen by a therapist on June 26, 2007, and had most recently been seen on December 17, 2007.  (R. 217.)  Plaintiff's treating diagnoses were dysthymic disorder; major depressive disorder, recurrent moderate; and personality disorder, NOS.  (R. 217.)  His GAF was 45. (R. 217.)  Plaintiff was taking Zoloft and Wellbutrin, with Ambien as needed.  (R. 218.)  Dr. Arking described Plaintiff as lethargic and socially isolated, and lacking motivation and energy to complete tasks or engage in doing things for himself.  (R. 217.)  He had difficulty with present memory and did not acknowledge time passing.  (R. 217.)  He had lost interest in hobbies and events and had lost his independence.  (R. 217.)

Dr. Arking observed that Plaintiff appeared to be detached from reality, and although he was articulate and expressive, Plaintiff's concentration and judgment appeared impaired. (R. 220.) Plaintiff's affect was flat and his mood was sad and depressed. (R. 220.) Dr. Arking noted that Plaintiff had difficulty with memory, tended to go off topic during therapy sessions, and stated that "time appears to just pass by" him. (R. 221–22.) Plaintiff made plans, but was "unable to take actions" due to low energy and lack of motivation. (R. 220–21.)

Dr. Arking noted that Plaintiff was capable of caring for his basic hygiene needs, as well as shopping for food and using public transportation. (R. 221.) Plaintiff was socially isolated, had a hard time interacting with peers, and had not developed relationships. (R. 222.) Dr. Arking stated that Plaintiff would have difficulty working in an environment with others, and noted that Plaintiff did not appear able to engage in work-related activities. (R. 222.) Plaintiff's sustained concentration and persistence was limited, and he needed to go at his own pace and work himself up in order to complete task. (R. 222.) Dr. Arking stated that Plaintiff was unable to compromise and would experience difficulty with supervisory instructions. (R. 222.) Dr. Arking concluded that Plaintiff had a limited ability to adapt to change in his personal life, and that it appeared he would have the same difficulty in a work environment, given his previous preference to work alone and at night during his pervious employment. (R. 222.)

In a treatment plan dated January 18, 2008, Dr. Arking noted that Plaintiff continued to be easily distracted and to focus on government policies and politics. (R. 262.) Plaintiff's treatment included helping Plaintiff acknowledge the passage of time, to remember things he did the prior week, to be motivated and to complete tasks. (R. 262.) Although Plaintiff had made some progress, Plaintiff continued to report that time seemed to just be passing by. (R. 262.) Plaintiff's GAF score remained 45. (R. 263.) Dr. Arking concluded that Plaintiff had made

minimal progress.  (R. 264.)  Plaintiff's treatment goals continued to be to try to complete one task per week.  (R. 265.)

### D.   Dr. Sander Koyfman

On April 18, 2008, Dr. Sander Koyfman, M.D., an attending psychiatrist at JBFCS, completed a treatment plan review, which reported that Plaintiff had made "minimal" progress towards his treatment goals.  (R. 269.)  Dr. Koyfman stated that Plaintiff had been prescribed a dosage of Risperdal, but it made Plaintiff irritable.  (R. 270.)  Plaintiff was using his watch as a way to be more aware of the time.  (R. 269.)  Plaintiff's GAF score was raised from 45 to 46, to recognize his increased awareness of the passage of time.  (R. 270.)

On July 18, 2008, Dr. Koyfman completed a treatment plan review and indicated that Plaintiff continued to make "minimal" progress towards his treatment goals.  (R. 276.)  Plaintiff again reported that time was "rapidly pass[ing] again," and he appeared socially uncomfortable. (R. 276.)  Plaintiff attended his psychotherapy sessions but tended to avoid discussing his feelings.  (R. 276.)  He had discontinued Zoloft and reported feeling less numb but more emotional as a result.  (R. 277.)  Plaintiff continued taking Wellbutrin and Ambien, and his GAF remained 46.  (R. 277.)

In a treatment plan review dated October 17, 2008, Dr. Koyfman again characterized Plaintiff's progress as "minimal."  (R. 283.)  Dr. Koyfman indicated that Plaintiff reported increased insomnia, appeared depressed, and reported still feeling numb, although less than he had previously.  (R. 283.)  Plaintiff appeared socially uncomfortable, described experiencing stressors from living with his mother, and described feeling uncomfortable during social interactions.  (R. 284.)  His GAF score was now 47.  (R. 284.)

On January 16, 2009, Dr. Koyfman completed another treatment plan review, and stated that Plaintiff had again made "minimal" progress and still had a GAF score of 47. (R. 290–91.) Plaintiff remained depressed, reported feeling numb, lacked energy and lacked motivation. (R. 290.) He remained socially isolated and described feelings of being a victim. (R. 290.)

On March 19, 2009, Dr. Koyfman signed a psychiatric medical report, which stated he had last examined Plaintiff on March 19, 2009. (R. 360–63.) Plaintiff was attending weekly individual therapy and monthly medication visits. (R. 360.) Plaintiff reported low energy, loss of previously acquired interest, tiredness, numbness, and sleeping problems. (R. 360.) His symptoms started after the events of September 11, when his business was affected. (R. 360.) He was diagnosed with major depressive disorder, recurrent, moderate; and personality disorder, NOS. (R. 360.) Plaintiff's GAF was 47. (R. 360.) Plaintiff presented as depressed, sad, and anxious, but also cooperative and calm. (R. 360–61.) Plaintiff was respectful but became agitated at times. (R. 360.) His speech was organized, clear, expressive, and appropriate. (R. 360.) Plaintiff's affect was often constricted. (R. 361.) His memory was poor, and he demonstrated significant distractibility and poor concentration. (R. 361.) Plaintiff lacked insight into his problems and their effect on his mood.

Dr. Koyfman further noted that Plaintiff did not appear to engage in any interests or hobbies. (R. 362.) Plaintiff was socially isolated and went out only as needed. (R. 362.) Plaintiff could cook and shop for himself but displayed impatience when waiting and when in crowds. (R. 362.) Plaintiff had not worked for several years; Dr. Koyfman opined that Plaintiff did not appear capable to be in a work environment. (R. 362.) Plaintiff had difficulty interacting with others, concentrating and paying attention for long periods of time. (R. 362.)

Dr. Koyfman assessed Plaintiff's ability to engage in work-related mental activities. He determined that Plaintiff's ability to remember and carry out instructions was affected by his impairment. (R. 364.) He opined that Plaintiff had "moderate" limitations understanding and remembering simple instructions, carrying out simple instructions, making judgment on simple work-related decisions, understanding and remembering complex instructions, and making judgments on complex work-related decisions. (R. 364.) Plaintiff had a "mild" limitation in carrying out complex instructions. (R. 364.) Dr. Koyfman stated that Plaintiff demonstrated difficulty remembering information, often needed to be reminded of things, was easily distracted, and needed to be redirected, and that, based on his daily routine, Plaintiff often felt tired and needed to rest. (R. 364.)

Dr. Koyfman further opined that Plaintiff had "moderate" limitations interacting with the public and responding appropriately to usual work situations and to changes in a routine work setting. (R. 365.) Plaintiff had "marked" limitations interacting appropriately with supervisors and with co-workers. (R. 365.) Dr. Koyfman indicated that Plaintiff would "shut down," and that he reported tiredness. (R. 365.)

### E. Samantha Belfon

In a letter dated April 30, 2009, Samantha K. Belfon, Licensed Master Social Worker, wrote that Plaintiff had been a client at the JBFCB Mid-Brooklyn clinic for the previous two years. (R. 368.) He presented with "profound symptoms of depression and anxiety" that "manifested in problematic sleep, social isolation, low energy and motivation to complete tasks, and a general sense of dysphoria." (R. 368.) Plaintiff reported a worsening of his depression after the events of September 11, which affected his business. (R. 368.) From 2003 to 2005, Plaintiff was treated at the JBFCB Manhattan West clinic, where he received services for

symptoms of depression and anxiety. (R. 368.) At the time of the letter, Plaintiff had decreased his prior alcohol consumption and continued to exhibit "significant symptoms of depression that affected his ability to function optimally." (R. 368.)

### F.    Continued treatment

The record shows that, from October of 2009 through July of 2012, Plaintiff continued to attend weekly psychotherapy sessions and monthly medication management appointments. (R. 626–73, 806–61, 910–17.) Treatment plan reviews through October of 2012 indicate that Plaintiff was chronically depressed, which condition manifested itself in problematic sleep, lack of energy and motivation and a sense of inertia and excessive tiredness at the thought of having to engage in a task. (*See* R. 626–73, 806–61, 910–17.) Plaintiff's GAF was consistently rated at 48. (*See, e.g.*, R. 628, 630, 636, 638, 644, 646, 652, 654, 660, 662.)

In July of 2010, Dr. Peter Bulow, M.D. reported "regression" in treatment. (R. 847.) Plaintiff remained unmotivated and expressed tiredness at the thought of engaging in a task. (R. 847.) In October of 2010, Dr. Bulow diagnosed Plaintiff as "chronically depressed." (R. 855.) In January of 2011, Dr. Bulow reported "minimal" progress and described Plaintiff as emotionally disconnected and reporting a sense of numbness. (R. 863.) According to Dr. Bulow, Plaintiff appeared "extremely stuck." (R. 863.)

In April of 2011, psychiatrist Dr. Gabriel Katz, M.D. described Plaintiff as "profoundly depressed" and concurred with the assessment that Plaintiff was "stuck." (R. 663.) Plaintiff showed signs of paranoid, schizoid, and dependent personality disorder. (R. 663.) In August of 2011, Plaintiff continued to have poor sleep and showed no progress towards his discharge goals. (R. 879.) The report noted that Plaintiff's treatment had become directed at efforts to decrease stagnation. (R. 881.) In January of 2012, Plaintiff reported that he struggled to motivate himself

and felt numb when thinking about changes.  (R. 635–41.)  A report in July of 2012 stated that Plaintiff was a "chronically depressed man," often lacking the energy and motivation to engage in regular activities.  (R. 910–17.)  Plaintiff remained "stuck" and in need of treatment to help him identify and pursue other goals.  (R. 911.)

### iv.   Consultative examiners[7]

#### 1.   Dr. Jonathan Belford, consultative psychiatric examiner

On October 5, 2012, Jonathan Belford, Psy.D., conducted a psychiatric evaluation of Plaintiff at the request of the Social Security Administration.  (R. 922–29.)  Plaintiff, who lived with his mother, traveled to the examination by train, unaccompanied.  (R. 922.)  Plaintiff reported a dysphoric mood and stated that he had been depressed most of his life.  (R. 922.)  He had difficulty falling asleep, which was often managed with medication.  (R. 922.)  Plaintiff reported being socially withdrawn, avoiding difficult situations, and getting panic attacks when in crowds.  (R. 922–23.)  He reported being anxious and worrying excessively.  (R. 923.)

Plaintiff was able to dress, bathe, and groom himself independently.  (R. 925.)  He could cook and prepare food, perform general cleaning, do laundry, shop, manage money, drive, and take public transportation.  (R. 925.)  Plaintiff avoided public transportation when possible.  (R. 925.)  Plaintiff was socially isolated and spent most of his time alone.  (R. 925.)  He reported no hobbies or activities for fun.  (R. 925.)  He took walks and assisted his sister with child care when possible.  (R. 925.)

---

[7]  Vinod Thukral, M.D., conducted in internal medicine examination of Plaintiff on October 5, 2012.  (R. 932–35.)  Given that Plaintiff's physical conditions and limitations are not relevant to Plaintiff's benefits application and ALJ Hein's decision, the Court does not summarize this examination.

Dr. Belford conducted a mental status examination of Plaintiff. (R. 923.) Plaintiff was cooperative and related in an adequate manner. (R. 923.) Plaintiff's motor behavior was normal, and his eye contact was appropriate. (R. 923.) Plaintiff's thought process was coherent and goal-directed. (R. 923.) His mood was neutral, and his affect was fairly flat. (R. 924.) Plaintiff's attention and concentration appeared intact, and his recent and remote memory seemed mildly impaired. (R. 924.) Plaintiff's insight and judgment were fair. (R. 924.)

Dr. Belford diagnosed Plaintiff with depressive disorder, NOS, and panic disorder without agoraphobia. (R. 925.) He determined that Plaintiff could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, and make appropriate decisions. (R. 925.) Due to his depression and anxiety, Plaintiff could not relate adequately to others or appropriately deal with stress. (R. 925.) Dr. Belford further opined that Plaintiff was "mildly" impaired in his abilities to carry out complex instructions and to make judgments on complex work-related decisions. (R. 926.) Plaintiff had no difficulty understanding and remembering simple instructions, carrying out simple instructions, making judgments on simple work-related decisions and understanding and remembering complex instructions. (R. 926.) Dr. Belford diagnosed Plaintiff as "moderately" impaired in his ability to interact with the public, supervisors and co-workers. (R. 928.)

## 2. Dr. Edward N. Halperin, medical expert

On June 14, 2013, Edward N. Halperin, M.D., a board-certified psychiatrist, reviewed Plaintiff's medical records and answered a series of interrogatories regarding Plaintiff's capacities. (R. 942–48.) With respect to the time period of May 25, 2005 to December 31, 2005, Dr. Halperin stated that Plaintiff's diagnosis was major depressive disorder, recurrent, moderate.

(R. 944.)  He stated that, during this time period, Plaintiff had only "mild" restriction in his daily activities, difficulties in maintaining social function, and difficulties in maintaining concentration, persistence or pace.  (R. 945.)

With respect to the time period of January 1, 2006 to the present, Dr. Halperin stated that Plaintiff had "marked" restriction of daily living activities and difficulties in maintaining concentration, persistence or pace, as well as "moderate" difficulties in maintaining social functioning.  (R. 945.)  While Plaintiff had "no deterioration" prior to December 31, 2005, Dr. Halperin determined that Plaintiff had "observable deterioration of concentration and activities of daily living after January 1, 2006.  (R. 947.)  Dr. Halperin concluded that, in light of the March 16, 2009 report by Dr. Koyfman, which rated Plaintiff's GAF as 47, Plaintiff's depression would be "seen as equaling [Listing 12.04]" after January 1, 2006, particularly given that Plaintiff had shown minimal improvement, had markedly reduced concentration and lacked insight.  (R. 944.)

### d.  Additional evidence

#### i.  Function report

On April 3, 2007, Plaintiff completed a function report as part of his application for disability benefits.  (R. 89–99.)  Plaintiff stated that his activities were limited because he could not motivate himself, forgot things, was fatigued, could not concentrate for long periods of time, and had trouble hearing with background noise.  (R. 89.)  He had "many nights of insomnia." (R. 90.)  Plaintiff changed clothes and bathed about once a week.  (R. 90.)  He shaved every few days and let his hair grow shaggy rather than keeping it neat.  (R. 91.)

Plaintiff had been living at his mother's house since June 1, 2005, after he lost his apartment because he was no longer able to pay the rent.  (R. 89–91.)  Plaintiff spent his days

eating, looking at the newspaper and walking.  (R. 90.)  Plaintiff's mother had to remind him to take his medication, and his mother and sisters prepared his meals.  (R. 91.)  Plaintiff performed household work after it "buil[t] up" over time, because he had to prepare himself mentally to do things.  (R. 92.)  Plaintiff went outside once or twice a day.  (R. 92.)  Plaintiff walked, drove, and used public transportation and was able to travel alone.  (R. 92.)  Plaintiff shopped once or twice a month, purchasing "basics" such as milk and bread.  (R. 93.)

Plaintiff spent time with his mother and sister, and assisted with his sister's children, if necessary.  (R. 94.)  He did not have difficulty getting along with family, friends, neighbors or others.  (R. 94.)  He had no problem getting along with bosses, teachers, police, landlords or other people in authority.  (R. 95.)  Plaintiff preferred to be left alone and did not "do much at all."  (R. 92.)  Plaintiff had difficulty paying attention and concentrating and could not finish tasks because he would lose motivation.  (R. 95.)  Plaintiff stated that stress affected him and could become "paralyzing at times."  (R. 96.)

### ii.    Vocational expert

Christina Boardman, a vocational expert, testified at the hearing in January of 2013 hearing.  (R. 422–37.)  She testified that Plaintiff's past relevant work as a photocopier was classified as light, skilled work in the *Dictionary of Occupational Titles* (DOT).  (R. 423; *see* U.S. Dept. of Labor, *Dictionary of Occupational Titles*, (4th ed., rev. 1991)).  Boardman stated that this description did not account for his managerial/administrative duties as owner of the business.  (R. 423.)  Boardman reported that work as a photocopier required more than occasional contact with the public.  (R. 424.)

ALJ Hein set forth the following hypothetical: a 46-year-old male, Plaintiff's age at date he was last insured, with an associate's degree and past relevant work as described, who has no

exertional limitations, but is limited to "simple, routine, repetitive work" with "less than occasional contact with the general public." (R. 429–30.) In response, Boardman identified unskilled medium and light jobs that such an individual could perform: cleaner, with approximately 113,600 jobs regionally and 2,068,460 nationally; linen room attendant with approximately 63,700 jobs in the regionally and 1,795,970 nationally; and garment sorter, with approximately 2,800 jobs regionally and 235,910 jobs nationally. (R. 430-31.)

### e. ALJ Hein's decision

ALJ Hein conducted the five-step sequential analysis as required by the Social Security Administration under the authority of the Social Security Act (the "SSA"). First, ALJ Hein found that Plaintiff last met the insured status requirements of the SSA on December 31, 2005, and that Plaintiff had not engaged in substantial activity since May 25, 2005, the alleged onset date. (R. 485.)

#### i. Step two

Second, ALJ Hein found that Plaintiff had major depressive disorder, a severe impairment. (R. 485.) In making this determination, ALJ Hein noted that, "[t]he record includes little medical evidence" of Plaintiff's "mental status" during the period from May 25 to December 31, 2005, and that "other than" Plaintiff's "reported but poorly documented" treatment at JBFCS, the record is "devoid of contemporaneous medical or nonmedical evidence" documenting treatment of Plaintiff's mental health treatment prior to the expiration of his disability insured status. (R. 485–86.) ALJ Hein stated that, relying on "subsequent treating records," and the opinion of Dr. Halperin, he nevertheless was "persuaded" that Plaintiff "had a depressive disorder" at the relevant time that this condition "more than slightly compromised his ability to meet the basic mental demands of work," and was therefore "severe." (R. 486.)

In reaching this conclusion, ALJ Hein observed that in Plaintiff's JBFCS treatment discharge summary from July 18, 2005, he was diagnosed with a personality disorder, but that the record was nevertheless "devoid of contemporaneous clinical findings" to support the diagnosis. (R. 486.) He concluded that, while Plaintiff "may well have a lifelong personality disorder," the record did not show "how this condition may have manifested itself or interfered with [Plaintiff's] functioning." (R. 486.) ALJ Hein stated he had no basis to conclude that such a disorder "affected [Plaintiff's] ability to meet the basic mental demands of work" during the relevant period. (R. 486.)

ALJ Hein further considered the treating records of Dr. Khan and found them to be "of little value in assessing whether [Plaintiff] had a 'severe' psychiatric disorder prior to the expiration of his disability-insured status." (R. 486.) ALJ Hein noted that Dr. Khan had treated Plaintiff since September 29, 2005 and diagnosed Plaintiff with depression and anxiety in 2007 and 2009, but determined that the record did not contain documentation of visits to Dr. Khan prior to February 7, 2007. Finally, ALJ Hein dismissed Dr. Koyfman's July 18, 2009 observation of schizoid personality disorder and the consultative examiner's diagnosis of panic disorder without agoraphobia in October of 2012 because "there is no medical basis" for a conclusion that either condition "had any impact" on Plaintiff's functioning before December 31, 2005. (R. 486–87.)

### ii. Step three

ALJ Hein next determined that Plaintiff does not have an impairment or combination of impairments that meets or is equal to the severity of one of the impairments listed in Appendix 1 of the Social Security Regulations. (R. 487.) ALJ Hein considered Listing 12.04, pertaining to affective disorders, and determined that Plaintiff's depressive disorder did not meet or medically

equal the criteria of that listing.  (R. 487.)

In considering whether Plaintiff satisfied "paragraph A" of Listing 12.04, which requires that the limitations be present at Plaintiff's onset date, ALJ Hein considered only the contemporaneous treatment records of JBFCS, and determined that JBFCS's records failed to document Plaintiff's "ongoing mental status or his compliance with and response to treatment . . . [or] how frequently he was seen for treatment" during the relevant period. (R. 487.)  ALJ Hein assigned "no weight" to the opinion in the JBFCS discharge report that Plaintiff was "regressing psychiatrically" because the report also observed that Plaintiff had demonstrated improved sleeping, was drinking less, and had been "appropriately expressing his emotions verbally."  (R. 487–88.)  ALJ Hein deemed the description of Plaintiff as regressing as an "unsubstantiated conclusion" and further observed that, while Plaintiff was discharged from JBFCS for "erratic attendance," Plaintiff also left a voicemail with JBFCS at that time stating he would be unavailable for treatment while traveling and visiting friends, "behavior that, in [ALJ Hein's] opinion, is not consistent with an individual suffering from disabling symptoms of depression [or] anxiety."  (R. 487–88.)  Finally, ALJ Hein noted that Plaintiff had not demonstrated that he "sought or received treatment for symptoms of depression during the last six months of 2005 of throughout" 2006.  (R. 488.)

In considering whether Plaintiff satisfied "paragraph B" of Listing 12.04, which requires that Plaintiff's symptoms result in at least two enumerated restrictions, ALJ Hein considered Plaintiff's testimony and contemporaneous treatment records of JBFCS.  (R. 488.)  ALJ Hein concluded that the JBFCS reports from October of 2003, at Plaintiff's intake, and from July of 2005, at his discharge, did not identify any "specific limitations" in Plaintiff's "daily living, social functioning, or concentration, persistence or pace unrelated to the reported loss of his

business and apartment." (R. 488.) ALJ Hein observed that, despite presenting to JBFCS with symptoms of depression and anxiety in October of 2003, Plaintiff continued to work until the business closed in June of 2005. (R. 488.) ALJ Hein discounted Plaintiff's testimony that, following September 11, he worked primarily in the back of the store and not with customers, because "the record is devoid of documentation corroborating that allegation." (R. 488.) ALJ Hein noted that Plaintiff also stated he was able to concentrate at night, when it was "very quiet and [he] could do one thing at a time." (R. 488.) ALJ Hein emphasized that the "longitudinal picture presented by the evidence . . . suggests that [Plaintiff's] problems were situational," in that he would have continued the copying business had it not failed. (R. 488.) As such, ALJ Hein concluded that, as determined by the consultative examiner Dr. Halperin, Plaintiff "manifested no more than mild limitations" from May 25, 2005 to December 31, 2005, and therefore does not satisfy the criteria of "paragraph B."[8] (R. 489.)

### iii. Step four

At step four, ALJ Hein determined that Plaintiff has the residual functional capacity to perform "the full range of work at all exertional levels," with specific nonexertional limitations. (R. 489.) He concluded that Plaintiff is "mentally limited to simple, routing, repetitive work with less than occasional contact with the public and co-workers." (R. 489.)

ALJ Hein noted that, aside from Plaintiff's "poorly documented" treatment at JBFCS, the "record is devoid of contemporaneous" evidence regarding Plaintiff's mental health symptoms and treatment," and that "all we have" to document his contemporaneous treatment is the

---

[8] ALJ Hein also concluded that the evidence failed to establish the criteria in "paragraph C" because Plaintiff did not present with a medically documented history of a psychotic or mood disorders of at least two years' duration, or with one or more years of inability to function outside a highly supportive living arrangement. (R. 489.)

discharge summary." (R. 490–91.) ALJ Hein considered the report from Plaintiff's JBFCS

intake, and concluded that the findings "reflected [Plaintiff's] ability to continue his work,"

which he did for a further nineteen months. (R. 490.) ALJ Hein found that, "curiously,"

Plaintiff stopped receiving treatment after he closed his business in June of 2005, "a

circumstance that one would think would exacerbate any symptoms of depression or anxiety."

(R. 490.) As he had at Step Three, ALJ Hein afforded "no weight" to the opinion in the JBFCS

discharge report that, at the time of his discharge, Plaintiff was regressing and experiencing an

increase in depressive symptoms as a result of the loss of his business and apartment. (R. 491.)

ALJ Hein concluded that, because the report simultaneously observed that Plaintiff had

improved sleep, decreased drinking, and appropriate emotional expression during treatment, the

conclusion of "regression" was "unsubstantiated." (R. 491.)

ALJ Hein further stated that he assigned "little, if any weight" to the GAF score of 50

assessed by Dr. Merken on July 26, 2005. (R. 491.) ALJ Hein observed that the JBFCS records

did not document whether Dr. Merken regularly treated Plaintiff, or when he had most recently

seen Plaintiff prior to issuing the score. (R. 491.) ALJ Hein concluded that the record is devoid

of any evidence corroborating the GAF rating or establishing that it represented anything more

than a snapshot picture" or Plaintiff's mental health. (R. 491.) ALJ Hein emphasized that this

conclusion was consistent with Plaintiff's telephone call to JBFCS indicating that he was

traveling and visiting friends and Plaintiff's failure to seek treatment for depression during the

last six months of 2005 or during 2006. (R. 491.)

ALJ Hein recited Judge Irizarry's directive to consider whether evidence after the last-

insured date could be relevant to whether Plaintiff was "continuously disabled" and whether the

evidence demonstrated a "continuity of symptoms between Dr. Merken's July [of] 2005

discharge summary and [Plaintiff's] condition in 2007." (R. 492.) However, ALJ Hein emphasized that the absence of records was the result of Plaintiff's failure to seek treatment between July of 2005 and June of 2007. (R. 492.) ALJ Hein noted that Plaintiff stated he continued his prescriptions of Zoloft and Ambien through Dr. Khan during that time period, but concluded that the record did not contain medical records to document any treatment for depression during those two years. (R. 492.) ALJ Hein also emphasized that Dr. Luft observed on August 7, 2007 that Plaintiff's depression had deteriorated during the few prior months, triggering his restart to treatment, which ALJ Hein stated indicated that Plaintiff "was doing sufficiently well for almost two years before he felt he needed to return" to treatment. (R. 494.) ALJ Hein also stated that no treating source had provided a "retrospective opinion" regarding Plaintiff's functioning from May 25 to December 31, 2005. (R. 492.)

ALJ Hein also found that Dr. Khan's opinions "applied most relevantly" to Plaintiff's condition "only after his date last insured," as ALJ Feldmeier had concluded. (R. 493.) As to Dr. Khan's July of 2007 opinion, which stated that Plaintiff had difficulty with attention, concentration and communication, ALJ Hein explained that these findings were "consistent with the [RFC] as given," which found that Plaintiff was limited to simple tasks and limited interaction. (R. 493.) As to Dr. Khan's February and March of 2009 opinions, ALJ Hein concluded these were entitled to "significant weight" as to Plaintiff's condition in 2009 but not as to his condition in 2005 because the opinions contained no clinical findings or treatment notes regarding Plaintiff's limitations in December of 2005. (R. 493.)

ALJ Hein determined that Plaintiff's "alleged inability to work due to depression or anxiety" was "unsupported by the objective and opinion evidence" and that Plaintiff's "uncorroborated statements concerning the intensity, persistence and limiting effects of his

alleged symptoms during the period at issue [were] somewhat exaggerated and lacking in credibility." (R. 493–94.) ALJ Hein identified multiple reasons that "detract[ed] from the credibility" of Plaintiff's claim — the absence of contemporaneous evidence documenting restrictions in Plaintiff's activities, Plaintiff's failure to seek treatment for two years, and the fact that Plaintiff waited until June of 2007 to seek benefits, over three-and-a-half years after first seeking treatment for depression. (R. 494.)

Finally, ALJ Hein determined that Plaintiff was not capable of performing his prior relevant work as a photocopy operator, because that job required contact with the public exceeding the RFC assessed by ALJ Hein. (R. 494.) ALJ Hein concluded that, given Plaintiff's age, education, work experience and RFC, there are jobs in the national economy in significant numbers that Plaintiff could perform, based on the testimony of the vocational expert. (R. 495.) Therefore, ALJ Hein concluded that, from May 25, 2005 through December 31, 2005, Plaintiff had not been suffering from a "disability" as this term is defined under the SSA. (R. 496.)

## II.  Discussion

### a.  Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same). Once an ALJ finds facts, the court

"can reject those facts only if a reasonable factfinder would *have to conclude otherwise.*" *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted). In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."). The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted). If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). "In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion.'" *McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

b.  **Availability of benefits**

Federal disability insurance benefits are available to individuals who are "disabled" within the meaning of the Social Security Act. To be considered disabled under the Act, a plaintiff must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and

work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* §§ 423(d)(2)(A). The Commissioner has promulgated a five-step analysis for evaluating disability claims. 20 C.F.R. §§ 404.1520. The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)); *see also Lesterhuis*, 805 F.3d at 86 n.2 (describing the "five-step sequential evaluation for adjudication of disability claims"); *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (describing "the five-step, sequential evaluation process used to determine whether a claimant is disabled" (citing 20 C.F.R. § 416.920(a)(4)(i)–(v))).

    **c. Analysis**

The Commissioner moves for judgment on the pleadings, arguing that ALJ Hein's decision that Plaintiff was not disabled prior to December 31, 2005 is supported by substantial evidence because his major depressive disorder did not preclude work. (Comm'r Mem. 24–31.) Plaintiff cross-moves for judgment on the pleadings, arguing that ALJ Hein: (1) erred by failing

to properly consider the evidence from 2007 and after; (2) improperly concluded that Plaintiff's personality disorder was not a severe impairment prior to December 31, 2005; and (3) erred in assessing Plaintiff's RFC, by relying on the ALJ's own subjective views and on Dr. Halperin's opinions. (Pl. Mem 20–32.) The Court first considers whether ALJ Hein complied with Judge Irizarry's directive to consider whether the medical evidence obtained subsequent to Plaintiff's last-insured date was relevant to the severity and continuity of Plaintiff's impairments before the last-insured date.

### i. ALJ Hein failed to properly consider the post-2005 evidence

As Judge Irizarry explained, the Second Circuit has recognized that "[e]vidence bearing upon an applicant's condition subsequent to the [last insured date]" can be "pertinent" to "the severity and continuity of impairments existing before the earning requirement date" and may also "identify additional impairments which could reasonably be presumed to have been present and to have imposed limitations as of the earning requirement date." *Lisa v. Sec'y of Dep't of Health & Human Servs.*, 940 F.2d 40, 44 (2d Cir. 1991) (citations omitted); *see Evans v. Colvin*, --- F. App'x ---, --- No. 15-CV-2569, 2016 WL 2909358, at *2 (2d Cir. May 19, 2016) ("[E]vidence from a later evaluation can be material to an earlier time period . . . . [S]uch evidence must be both (1) relevant to the claimant's condition during the relevant period and (2) probative . . . ." (citing *Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004))); *Williams v. Comm'r of Soc. Sec.*, 236 F. App'x 641, 644 (2d Cir. 2007) (stating that the district court erred in "finding that remand was not required because [new evidence] post-dated the period for which benefits had been claimed" (citing *Pollard*, 377 F.3d at 193)); *but see Edwards v. Shalala*, 165 F.3d 13 (2d Cir. 1998) ("Although medical evidence prior and subsequent to an alleged period of disability may demonstrate that a claimant was disabled, a failure to provide evidence for that

period seriously undermines [the claimant's] contention that he was continuously disabled during that time." (citation omitted)).

As such, medical evidence obtained after an applicant is insured for disability insurance benefits, including where a treating source provides a retrospective diagnosis, can be used to show that the applicant was disabled before the specified date. *See Pollard*, 377 F.3d at 194 (finding that "the district court erred insofar as it categorically refused to consider," as evidence of disability, records "generated [after the relevant time period] and [that] did not explicitly discuss [the claimant's] condition during the relevant time period" (citing *Lisa*, 940 F.2d at 44)); *see also Woodmancy v. Colvin*, 577 F. App'x 72, 75 (2d Cir. 2014) ("[W]hile a treating physician's retrospective diagnosis is not conclusive, it is entitled to controlling weight unless it is contradicted by other medical evidence or overwhelmingly compelling non-medical evidence." (quoting *Byam v. Barnhart*, 336 F.3d 172, 183 (2d Cir. 2003))); *Rivera v. Sullivan*, 923 F.2d 964 (2d Cir. 1991) (reviewing Second Circuit law on retrospective diagnosis and reversing denial of benefits where retrospective diagnosis of treating physician was not given sufficient weight with regard to degenerative condition); *Arnone v. Bowen*, 882 F.2d 34, 39 (2d Cir. 1989) (noting that medical evidence obtained subsequent to a last insured date "is not irrelevant to the question whether the claimant had been continuously disabled"). In *Pollard*, the Second Circuit reversed the district court's determination that later evidence could not be considered because it "did not explicitly refer to the relevant time period" and held that the evidence could nevertheless be relevant to showing that the claimant's mental health condition had been continuously more severe. *Pollard*, 377 F.3d at 193 (discussing later evidence submitted to demonstrate the severity of the claimant's attention deficit hyperactivity disorder and oppositional defiant disorder, including a letter regarding ongoing symptoms and behavior,

documentation of a recent hospitalization, a report detailing current mental health services, and a psychiatric assessment).

Here, ALJ Hein failed to consider the relevance of Plaintiff's medical records after 2005 in determining whether Plaintiff's condition had been continuously severe during the relevant time period. In assessing Plaintiff's RFC, ALJ Hein repeatedly cited the absence of contemporaneous records from December of 2005 as a basis for concluding that Plaintiff was not disabled. ALJ Hein noted that, aside from Plaintiff's "poorly documented" treatment at JBFCS, the "record is devoid of contemporaneous" evidence regarding Plaintiff's mental health symptoms and treatment," and that "all we have" to document Plaintiff's treatment and limitations at his last-insured date is the JBFCS discharge summary. (R. 490–91.) ALJ Hein failed to discuss or consider Plaintiff's records from 2006 and later that could have pertinence to Plaintiff's limitations in 2005.

For example, ALJ Hein did not consider Dr. Arking's January of 2008 opinion that Plaintiff would have difficulty in a working environment with others and that Plaintiff did not appear able to engage in work-related activities. (R. 222.) Dr. Arking explained that this conclusion was based on limitations in Plaintiff's sustained concentration and persistence and on Plaintiff's inability to compromise; Dr. Arking determined that Plaintiff had a limited ability to adapt to change in his personal life, and that it appeared Plaintiff would have the same difficulty in a work environment, given his previous preference to work alone and at night during his previous employment. (R. 222.) ALJ Hein made no reference to Dr. Arking and gave no consideration to whether his opinion was relevant to assessing Plaintiff's ability to engage in work-related activities in 2005.

ALJ Hein likewise ignored Dr. Koyfman's March 19, 2009 medical report, in which Dr. Koyfman opined that Plaintiff did not appear capable of functioning in a work environment. (R. 362.) Similarly, ALJ Hein failed to consider the numerous reports labeling Plaintiff's condition as "chronic" or "lifelong" depression, and failed to consider whether these reports could indicate that Plaintiff's symptoms had been consistent and continuous since 2005. (*See* R. 174, 349, 855, 917.)

ALJ Hein also disregarded the relevance of Dr. Khan's 2009 opinions. ALJ Hein found that Dr. Khan's opinions "applied most relevantly" to Plaintiff's condition "only after his date last insured," and stated that this conclusion was consistent with that of ALJ Feldmeier. (R. 493.) ALJ Hein improperly concluded that Dr. Khan's opinions issued in February and March of 2009 were only entitled to "significant weight" as to the date of signature, and had "relevance when [Dr. Khan] signed them, but not prior," because the opinions did not specifically refer to Plaintiff's limitations in December of 2005.[9] (R. 493.) In contrast to ALJ Hein's conclusion, Dr. Khan specifically noted in his March of 2009 report that his diagnosis was retroactive. ALJ Hein was incorrect in summarily concluding that Dr. Khan's opinions were irrelevant to assessing whether Plaintiff's condition was continuous and severe prior to 2009, even if Dr. Khan made no reference to Plaintiff's limitations in 2005. *See Pollard*, 377 F.3d at 193 (concluding that later evidence, which did not reference that time period, "directly supports" that "during the relevant time period, [the claimant's] condition was far more serious than previously thought").

---

[9] As to Dr. Khan's July of 2007 opinion, which stated that Plaintiff had difficulty with attention, concentration and communication, ALJ Hein did not explicitly state the weight given to this opinion. (R. 493.) Instead, ALJ Hein stated that Dr. Khan's findings were "consistent" the RFC limiting Plaintiff to simple tasks and limited interaction. (R. 493.)

In addition, ALJ Hein failed to consider whether the post-2005 records were relevant to the severity and continuity of Plaintiff's impairments by ignoring ongoing documentation of Plaintiff's GAF score. ALJ Hein stated that he assigned "little, if any weight" to the GAF score of 50 assessed by Dr. Merken on July 26, 2005 in the JBFCS discharge report. (R. 491.) ALJ Hein supported this conclusion by stating that the record contained no evidence "corroborating that GAF rating or establishing that it represented anything more than a snapshot picture" of Plaintiff's mental health. (R. 491.) However, the subsequent records show that, since 2007, Plaintiff's treating sources at JBFCS consistently rated Plaintiff's GAF as fluctuating between 45 and 50. (*See* R. 217, 253, 256, 263, 270, 277, 284, 290, 325, 328, 360.) ALJ Hein failed to contemplate whether these records could demonstrate that Plaintiff had a continuously below-50 GAF, including on December 31, 2005, despite Judge Irizarry's specific observation that the JBFCS records "might demonstrate a continuity of symptoms between Dr. Merkin's July [of] 2005 discharge summary and [Plaintiff's] condition in 2007" because the JBFCS professionals had "reached similar conclusions to those reached by Dr. Merkin in 2005." *See Stewart*, 2012 WL 314867, at *10 ("Even the possibility that these medical findings by the psychiatrists at JBFCS might demonstrate a continuity of Plaintiff's mental limitations 'obligates[s] the ALJ to explore the possibility that the diagnoses applied retrospectively to the insured period.'" (quoting *Martinez v. Massanari*, 242 F. Supp. 2d 372, 378 (S.D.N.Y. 2003)).

Finally, ALJ Hein did not consider later records as relevant to the severity of Plaintiff's condition in December of 2005 and whether he was "regressing" when he temporarily ceased treatment. ALJ Hein afforded "no weight" to Dr. Merken's opinion of July 26, 2005 that Plaintiff was regressing and experiencing an increase in depressive symptoms as a result of the loss of his business and apartment. (R. 491.) ALJ Hein found that the conclusion of

"regression" was "unsubstantiated" because the report also observed that Plaintiff had improved

sleep, decreased drinking, and appropriate emotional expression during treatment. (R. 491.) In

reaching this conclusion, ALJ Hein omitted any references to records that could support the

conclusion that Plaintiff was regressing, such as observations by Dr. Luft on July 17, 2007 that

Plaintiff had reentered treatment because his symptoms worsened after he moved to live with his

mother in Brooklyn in 2005. (R. 252, 328.) Instead, ALJ Hein only noted that Dr. Luft observed

on August 7, 2007 that Plaintiff's depression had deteriorated during the few prior months,

which indicated to ALJ Hein that Plaintiff "was doing sufficiently well for almost two years

before he felt he needed to return" to treatment. (R. 494.) ALJ Hein also emphasized that

Plaintiff's telephone call to JBFCS indicating that he would be traveling and visiting friends

showed that the assessment of regression was unsupported.[10] (R. 491.) ALJ Hein was not

entitled to omit any discussion of later records that were consistent with an indication that

Plaintiff's symptoms worsened in 2005, in favor of discussing only facts that indicated Plaintiff's

social isolation briefly waned in 2005. *See Aviles v. Comm'r of Soc. Sec.*, No. 15-CV-2992,

2016 WL 1642645, at *5 (E.D.N.Y. Apr. 25, 2016) (holding that, in reaching a determination

about whether a claimant is disabled, the ALJ cannot "simply pick and choose from the transcript

only such evidence that supports his determination, without affording consideration to evidence

---

[10]  Plaintiff argues that ALJ Hein relied on "his lay assessment of the record" because he
"relied heavily and repeatedly on [Plaintiff's] lack of psychiatric treatment" as evidence of
non-disability. (Pl. Mem. 28.) ALJ Hein stated throughout his opinion, that Plaintiff's decision
to cease treatment reflected improvement, without citing to any evidence to support such a
conclusion. ALJ Hein noted that, Plaintiff stopped receiving treatment after he closed his
business in June of 2005, "a circumstance that one would think would exacerbate any symptoms
of depression or anxiety," but ALJ Hein failed to consider the fact that Plaintiff's symptoms had
deteriorated to the point that Plaintiff was incapable of consistently traveling to treatment
appointments. (R. 490.)

supporting the plaintiff's claims." (quoting *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004))).

While ALJ Hein was entitled to determine whether the record in its entirety supports the conclusion that Plaintiff was not disabled on December 31 2005, it was improper for the ALJ to consistently fail to consider the records of Plaintiff's treatment post-2005 — in 2007 and later — and to fail to follow the directions of Judge Irizarry. Accordingly, ALJ Hein lacked substantial evidence to conclude that Plaintiff was not disabled as of his last-insured date. Because the Court remands the case for further consideration of the full medical evidence, the Court will not address Plaintiff's remaining arguments, as ALJ Hein's errors impact the Court's ability to review his other determinations.

## III. Conclusion

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied and Plaintiff's cross-motion for judgment on the pleadings is granted. The Commissioner's decision is vacated, and this action is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of Court is directed to close this case.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: September 23, 2016
        Brooklyn, New York